[Crim. No. 9845. First Dist., Div. Four. Apr. 12, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL BLANCHARD AYLWIN et al.,
Defendants and Appellants.

**COUNSEL**

Jack Leavitt, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DEVINE, P. J.**—Michael Blanchard Aylwin, Timothy William Butler, and Craig Burns Champie appeal from a judgment entered on a jury verdict which found them guilty of violation of Penal Code section 182 (conspiracy to manufacture lysergic acid [LSD]), violation of Health and Safety Code section 11910 (possession of LSD), and violation of Health and Safety Code section 11912. The section 11912 charge was manufacture of LSD, but the jury found appellants guilty of attempt to manufacture the forbidden drug.

The case is primarily one of that species of search and seizure cases which comprise the subject of fruit of the poisonous tree. It is convenient to commence with the time when the fruit was plucked. That the defendants are guilty of the offenses, if the fruit was not infected by organisms within the tree, is not open to doubt. They were running a full-fledged factory

for the manufacture of LSD at 212 South MacPherson Street, Fort Bragg, Mendocino County, at the date of their arrest, June 16, 1970. Apparently because of the size of the operation, some 15 to 20 police officers surrounded the rented house at 212 South MacPherson Street. Upon entry, the officers found a large number of chemicals, including LSD, laboratory equipment, and an eight-page formula for the manufacture of LSD. The officers were armed with a search warrant which contains an unchallenged description of the place to be searched, and the things to be seized.

Although some point is made of the manner of entry, violation of Penal Code section 1531 being asserted, this point may be disposed of readily. An agent knocked on the door and shouted, "Police officers. We have a search warrant." The door was open at least three-quarters of the way. Upon knocking, Agent Filben "heard what I thought sounded like running feet." He also testified that he heard the sounds of machinery running and glass breaking. At the door, Filben detected the "chemical smell" of either ether or acetone. After waiting about five seconds from the time he had knocked, Filben and the other officers entered the house. Filben stated that he "rushed in because [he] heard the running feet." Filben also testified that he feared that Jean Rodigou, whom he expected to see within the house, might resort to violence. His belief was apparently based on a report of Rodigou's confrontation with a Mrs. Hazen, to which reference is made below. Moreover, Filben feared the possibility of an explosion because, he testified, "I consider all laboratories as potentially dangerous in that the chemicals used are volatile. . . . I also talked with other officers who have investigated laboratories that have exploded wherein people have been maimed, killed, injured." He admitted, however, that no LSD laboratory to his knowledge had ever exploded.

When the officers entered the dwelling one of the occupants demonstrated his appreciation of the purpose of the visit. He tried to escape through a window. It was either Jean Rodigou, Timothy Butler, or Craig Champie. Others arrested were Michael Aylwin and Katharin Thomas. Under the circumstances, there was no violation of section 1531.

The search and seizure procedure in execution of the warrant having been valid, we must go next to the subject of validity of the search warrant. Appellants contend that the warrant is invalid and cannot support the search and seizure because two important elements used to support it are themselves contaminated with illegality. The first is the search of a cabin in Amador County on May 26, 1970; and the second is the arrest, on June 9, 1970, of Ronald Wiggins and his search shortly after the arrest at the Fort Bragg police station.

### Search of the Cabin in Amador County

■ Although none of the appellants owned or rented this cabin in Amador Pines, a summer home area, owned by Mrs. Arthur, evidence was found within the cabin: first, that an LSD laboratory was being operated or assembled there; second, a quantity of the drug itself, LSD, was also found; third, appellant Butler's sweater, appellant Champie's motorcycle, and electrical cords belonging to appellant Aylwin were within the cabin;[1] and fourth, moving pictures of operators' hands in the process of using laboratory facilities in a manner consistent with the manufacture of LSD. It is contended by appellants that the search was illegal under the rule of *Horack* v. *Superior Court,* 3 Cal.3d 720 [91 Cal.Rptr. 569, 478 P.2d 1], and that the allegations in the affidavit for the warrant of searching 212 South MacPherson Street having been produced by illegal search, that warrant was illegally obtained.

In May 1970, Mrs. Dorothy Arthur rented her cabin in Amador Pines, Amador County, California. The rent was $80 per week. Apparently Dixie Lockwood paid $70 towards the rent and received the key to the cabin. On May 26, 1970, Mrs. Fayann Hazen, who lived near the Arthur cabin, was taking a walk. During this walk she saw "two unfamiliar characters," later identified as Jean Rodigou and Dixie Lockwood, walking along the roadway. Rodigou was carrying two pails of groceries, and Miss Lockwood had a box. They told Mrs. Hazen they were camped nearby. The nearest grocery store was six miles away. Mrs. Hazen suspected they had stolen the groceries because there had been a report of cabins being broken into and because there could be no "other reason" for carrying groceries along the road in pails. Therefore, Mrs. Hazen reported Rodigou and Lockwood to the sheriff.

Deputy Sheriff Schremser, with two back-up officers, apprehended Miss Lockwood. After giving her *Miranda* warnings, Schremser questioned her about her campsite, the identity of her male companion, and the groceries. She admitted having burglarized two cabins with the male companion. These two cabins were within a quarter of a mile of the Arthur cabin. When asked about the Arthur cabin, Miss Lockwood refused to relate anything. Mrs. Hazen subsequently identified Miss Lockwood as the girl she had seen on the roadway. At the same time Mrs. Hazen asked Schremser "if my husband and I could check cabins in the area, because many of the cabins belonged to people we knew." Schremser granted this permission.

---

[1] The ownership of these items was ascertained by extensive subsequent investigation.

Without entering any cabins, Mr. and Mrs. Hazen discovered evidence of break-ins at two cabins. The Arthur cabin was lighted so Mrs. Hazen decided to ask the people in it if they had seen anyone. Before reaching the door the man she had seen on the roadway with the groceries came out of the cabin. Mrs. Hazen asked him if he was leasing the premises, and he replied in the negative. As Mrs. Hazen started to leave, he got between her and the entrance to the porch, apparently trying to prevent Mrs. Hazen from leaving. Mrs. Hazen, "a little scared," drew and fired a revolver without attempting to hit Rodigou. Mr. Hazen then came from the car "and told him that he should come with us, because the deputy sheriff would probably like to talk to him. So he came along." After giving a false name and being advised by Schremser of his *Miranda* warning rights, the man remained silent.

Schremser was suspicious that the Arthur cabin had been burglarized and therefore went to the cabin and searched the outside for evidence of forcible entry. Schremser based his suspicions of burglary on the fact that Rodigou had been identified as the associate of Miss Lockwood, an admitted burglar. Also supportive of such suspicions were the facts that Amador Pines was a high crime area, with some 35 cabins burglarized in the first six months of the year, and that Schremser had observed the cabin was unoccupied the day before. Finding no evidence of forcible entry, Schremser knocked on the door, "lightly, though, so they wouldn't hear it upstairs if there was anyone inside." Then he opened the unlocked door, entered, and observed a motorcycle which had been sold to appellant Champie. Mrs. Arthur apparently had not given the police permission to enter her cabin at this time. Her permission was not obtained until after the search.

The officer searched each room of the cabin for a point of entry. When he entered the far east bedroom he discovered laboratory equipment. Specifically, he found a metal container of ergotomine tartrate, scales, a bottle of nitrogen or oxygen, a vacuum distillation apparatus, sulfuric acid, and glass tubing and containers. In an open dresser drawer within this room he discovered two vials of white powder. He took one of these vials to his office and conducted a chemical analysis of its contents. The test indicated the substance might be LSD. A search warrant was then issued on the basis of the officer's observations and test of the chemical. The search revealed Jean Rodigou's fingerprints, electrical cords purchased by appellants Aylwin and Champie, a sweater apparently owned by appellant Butler, lysergic acid, potassium sulfate, and ergotomine tartrate. Before Narcotics Agent Filben executed his later affidavit to support the search warrant for 212 South MacPherson Street, Fort Bragg, Schremser had given him the

information about the motorcycle, the ergotomine tartrate, the electrical cords, and the sweater.

It is contended by appellants that the search was illegal under the holding of *Horack* v. *Superior Court*, 3 Cal.3d 720 [91 Cal.Rptr. 569, 478 P.2d 1]. We find sufficient elements of distinction between the two cases to justify the search in the present case. In *Horack*, the dwelling which was entered was in the City of Newport Beach; in *Rodigou* (we give this name because Rodigou was the occupant), the cabin was some six miles away from the nearest town; in *Horack*, the entry was at one o'clock in the afternoon; in *Rodigou*, it was at nighttime; in *Horack*, the report which the police had received was stated to have been from the next-door neighbor, a Mrs. Hamplin, but the police did not know that the call actually came from her and if they had so known, they had no evidence of her reliability (p. 726), the report was that two hippie-type individuals (the officer did not know what was meant by this term) had entered a residence which she believed to be vacant, carrying sleeping bags; in *Rodigou*, the officer knew that Miss Lockwood had confessed to burglarizing nearby cabins with a male companion and that she had refused to answer anything about the Arthur cabin, he knew that Rodigou, who was present at the cabin, had been identified by Mrs. Hazen as Miss Lockwood's companion, and that Miss Lockwood had said her companion had participated in burglarizing two cabins; in *Horack*, there was no testimony or evidence of the particular nature of the area as to the extent of the crime; in *Rodigou*, the officer knew that there had been some 35 burglaries of cabins in the first 6 months of the year and, of course, he had evidence that burglaries had been perpetrated by Lockwood and Rodigou within a few hours of his entry into the cabin, he had observed, if somewhat casually, that the cabin was not occupied on the previous day, and he had been told by Mrs. Hazen that Rodigou (then calling himself Elling) had told her that he had not been renting the cabin, and that Miss Lockwood had referred to staying with her companion at a *campsite*. The deputy sheriff had probable cause to believe that the cabin had been burglarized. The deputy entered, he testified, to secure the premises and to notify the owner. He had asked Mrs. Hazen where the owner, Mrs. Arthur, lived and she had replied that she did not know. He had asked Rodigou (Elling) if he had a right to be within the cabin, but the man refused to answer. His coming upon an LSD laboratory within the cabin was, as described in *Lockridge* v. *Superior Court*, 3 Cal.3d 166, 171 [89 Cal.Rptr. 731, 474 P.2d 683], "pure happenstance."

Although we are satisfied that the entry by Deputy Schremser was, under all of the circumstances, a reasonable one and was not violative of the

*Horack* holding, nevertheless because the controversy in fruit of the poisonous tree cases often centers about the matter of deterring police officers from illegal searches by depriving them of any profit from their misconduct, by exclusion of the evidence, we deem it proper to note that when Schremser entered the cabin on May 26, 1970, *Horack* was still six months away into the future. The officer could not be expected to predict that the Supreme Court, by four to three vote, would decide against the kind of protective search that was involved in that case. This is not to say that *Horack* would not control if the cases were comparable, but simply that to the extent that the poisonous tree doctrine, which by its very nature is somewhat uncertain, depends on a guilty act on the part of an officer, the doctrine would not have ready application in this case.

Moreover, the officer who was looking not for contraband or stolen property which might be *in* the cabin, but rather for means of securing the cabin so that goods might not be moved *out* of it, came upon the spectacle of a chemical laboratory and the suspicious white powder in this summer home, an unlikely place for a drug manufacturing operation. He proceeded to make his disclosure known to a magistrate and to obtain a search warrant. (In *Krauss* v. *Superior Court,* 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023], similar procedure disinfected even a patent primary illegality.) It will be recalled that none of the products of the search even under the warrant became evidence in the trial upon the crimes committed in Mendocino County. But insofar as the evidence obtained under search warrant of the Amador County cabin is concerned, it is our conclusion that the tree was not a poisonous one; first, because there was no violation of *Horack,* and second, because the search was carried on under a warrant after the officer had stumbled upon his unexpected discovery.

Finally, in the matter of the Amador episode, it will be observed that what was discovered was that certain persons, including appellants, apparently were able and willing to engage in the manufacture of LSD. But to narrow the scope of their activities to the Fort Bragg operation took a great deal of police work involving several other sources of information than that obtained at the cabin in Amador County, as will be related below.

### Evidence Acquired Independently of Any Search

Although, as we have said above, the entry of the cabin may hardly be regarded a search at all, nevertheless we shall consider under the present heading evidence which could not possibly be regarded as the product of anything like a search. To describe completely the activities of all of the persons who were engaged in the enterprise, the culminating acts of which

were done at South MacPherson Street, would require a lengthy narrative. It is sufficient to give the major acts which came to the attention of the law enforcement officers, which the officers proceeded to integrate, and from which they came to the conclusion that the illegal operation was being conducted in the house which ultimately was entered in pursuance of the search warrant. On June 4, 1970, Ron Wiggins (who originally was a defendant but who later testified for the prosecution) purchased potassium, bipththalate, benzine, and sulphuric acid, all of which are components in the manufacture of LSD, in Seattle, Washington, using the name as buyer, "Tek, Inc." On the same day, Wiggins flew to Portland, Oregon, and bought from Scientific Laboratory Supply Company diethylamine, which is also used to manufacture LSD. Wiggins then flew to Oakland, California. Thereafter he eluded pursuit by complicated maneuvers of his vehicle.

On June 3, 1970, a private airline informed Lieutenant Stefani of the Sonoma County sheriff's office that several people and laboratory gear and chemicals had been transported to the Sonoma County airport. There, the lieutenant saw a vacuum pump in a cardboard box, a set of gram scales, a condenser, a number of packages of filter paper, glassware and glass tubings commonly found in labs, several bags of dry ice, several jugs of ammonia sulphate and two boxes of sulphuric acid, powder form. On June 4, one of the pilots informed the officers that Wiggins, one of the persons he suspected, was about to fly to Seattle. This made possible the surveillance at Seattle. One of the passengers had told this pilot, in response to a question, that they had a lab and that the transported gear was just to replace breakage. This was said by a man identifying himself as Pat Cassidy; but it was later established from photographs, prior to the affidavit for the search warrant, that Cassidy's true name is that of appellant Aylwin.

Thereafter, the officers staked out a residence in Summer Home Park, into which various boxes and a gas cylinder were loaded by appellant Butler. When this residence was abandoned, an officer noted a very strong odor of ether and other chemicals smelling familiar to illicit laboratories which the officer had known. On June 9, 1970, Aylwin picked up chemicals at Hayward, California, and carried them by plane to Santa Rosa. These chemicals were acetonitrite and triflouraceticanhydride, which are also used in the manufacture of LSD. Surveillance of a vehicle which had been loaded by Aylwin and either Champie or Butler showed that a box similar to the one removed from the airplane after the trip from Hayward traced progress of the vehicle beyond Willits towards Fort Bragg. On June 15, 1970, Inspector Carlstedt of the Sonoma County sheriff's office, having received information that two of the subjects were going by plane to the

Little River Airport in Mendocino County, placed himself at the airport and saw Aylwin and Champie, having alighted from the plane, depart by taxicab, and he followed them to South MacPherson Street in Fort Bragg and he saw them on foot near the residence at 212.

It will be seen from all of the above that a very active process of investigation and surveillance was being carried on and that a large amount of useful information was being supplied by the airline. These operations by the police not only would have attenuated any information illegally acquired in Amador County (although we do not depart from our conclusion that there was no illegality there), but, what is probably more important, they remove from the results of the search of Wiggins, described below, the connection which otherwise might be destructive to the search at South MacPherson Street.

However, analysis of the whole factual situation and of the law follows narration of the Wiggins search.

### Search of Wiggins

On June 9, 1970, at about 1 a.m., an officer of the Fort Bragg Police Department observed a vehicle being driven erratically at a high rate of speed, swerving and with sparks emerging under the vehicle. The officer stopped the vehicle and arrested the driver, Wiggins, for reckless driving. Later Wiggins was arrested for possession of marijuana which was found in the vehicle. Actually, there were four searches during the episode between the time of the arrest and the booking at the jail house. The first was a thorough search of Wiggins' person. This was illegal under the holding of *People* v. *Superior Court (Simon)*, 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205] (although the *Simon* case had not yet been decided and there were prior decisions by the Courts of Appeal, disapproved in *Simon*, upon which the police officer might reasonably have relied). But this is academic because the search produced nothing. The second search was of the vehicle, and it produced marijuana, which was found in a pocket of the car. The Attorney General concedes that this search was illegal, under the holdings of *People* v. *Superior Court (Kiefer)*, 3 Cal.3d 807, 812-813 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], and *Gallik* v. *Superior Court,* 5 Cal.3d 855 [97 Cal.Rptr. 693, 489 P.2d 573]. The marijuana, of course, had nothing to do with the matter of production of LSD, but it probably did have a good deal to do with the detention and further search of Wiggins' effects at the jail house. The third search was of the trunk of the vehicle, in which a drum of sulphur trioxide was found. This search likewise was illegal. But it was of little effect, even assuming that the chemical was

useful in the LSD enterprise. It will be noted from the recitation of facts under the heading, "Evidence Acquired Independently of Any Search," that Wiggins' activities in purchasing chemicals in Seattle and Portland were already known. A concealed officer actually had witnessed the buy in Seattle.

We come now to the final search, which was at the jail house. The officers found in the inside hatband of Wiggins' hat a note referring to picking up described chemicals from "Scientific Supply, 600 S. Spokane," stating, "You work for Mr. George Purdell" (this was the alias of Aylwin) and "Tek Chem. Co. Inc." (the name "Tek, Inc." had been found on a piece of paper in the Amador Pines cabin). This note likewise did no more than provide some circumstantial evidence that Aylwin was engaged in the enterprise of manufacturing illicit drugs, a conclusion to which independent evidence already pointed. But the most important element was the taking from Wiggins' wallet of a note reading, "R. C. Stoecker, 520 S. Franklin— 964-2113." Shortly after Wiggins' search, officers talked to Mrs. Stoecker at the Franklin Street address, learned from her that she had rented 212 South MacPherson Street, Fort Bragg to a male who gave his name as Bill Edwards but whom she identified from photographs as appellant Butler. She also identified Butler's companion from photographs as Ron Wiggins. Thereafter, the officers saw an empty can of ether and a box or bag of filter papers at the MacPherson Street address, and they placed the house under surveillance. It is argued by appellants that the search of Wiggins' person was illegal and that it produced evidence which led the police to the place of seizure of evidence, 212 South MacPherson Street.

■ We find that the search was illegal. Wiggins was not given the opportunity to make bail on the traffic violation. He did have something over $50 on his person, and he testified that had he been informed he might have arranged to have additional money sent to him. He was not given the opportunity. No doubt the officers were influenced by the fact that not only was Wiggins arrested on the traffic violation, but also that marijuana had been found in his vehicle.

### Analysis of the Essential Facts and of the Law

■ Our conclusions are: 1) that, as stated above, the entry of the Amador Pines cabin was legal; 2) that if it were held that it was an illegal search of the cabin, the fruit of the poisonous tree doctrine does not prevent the use of the evidence later secured at Fort Bragg; 3) that the search of Wiggins' wallet was illegal; 4) that the taint of this illegal search was dissipated, so that the fruit of the poisonous tree doctrine did not prevent the

use of the evidence taken under search warrant at Fort Bragg. (Of course, if our conclusion as to the legality of the entry of the cabin be correct, discussion of the fruit of the poisonous tree doctrine would be pointless in respect of what was found during that entry. Therefore, the present discussion of our conclusions commences with the second of these and with the assumption, for the purpose of discussion only, that the entry of the cabin was illegal.)

The essential question in these cases has been stated succinctly, namely, " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed. 2d 441, 455, 83 S.Ct. 407]; *Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 169-170; *Krauss* v. *Superior Court,* 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1203]; Maguire, Evidence of Guilt (1959) p. 221.) The answer to the question, however, cannot be had by anything like a formulary process. Perhaps the method of assaying the substance of the connection between the primary illegality and the proof is not so vague a process as to be denominated, as it has been, "intuitive." (Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness,* 15 U.C.L.A. L.Rev. 32, 38; Edgerton, *Legal Cause,* 72 U.Pa.L.Rev. 211.) But at least a good deal of the analyzing must be done on a case-to-case basis. We do have, however, some criteria mentioned in judicial decisions, and we shall measure the instant case in part by these.

1. The first is the inevitable discovery rule. If illegally obtained evidence would have been discovered in any event, then what was obtained unlawfully may be admitted. (*People* v. *Teale,* 70 Cal.2d 497, 506-507 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Chapman,* 261 Cal.App.2d 149, 169 [67 Cal.Rptr. 601]; *People* v. *Thomsen,* 239 Cal.App.2d 84, 91 [48 Cal.Rptr. 445]; *Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 170; *Wayne* v. *United States,* 318 F.2d 205, 209 [115 App.D.C. 234]; *Somer* v. *United States,* 138 F.2d 790, 792; cf. *People* v. *Stoner,* 65 Cal.2d 595, 602, fn. 3 [55 Cal.Rptr. 897, 422 P.2d 585]; see also R. Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule* (1964) 55 J.Crim.L. C. & P. S. 307, 314-317.) A more particular application of this rule quite relevant to the case at hand is found in *People* v. *Kanos,* 70 Cal.2d 381, 386 [74 Cal.Rptr. 902, 450 P.2d 278], where the officers knew of the defendant's approximate whereabouts but learned of his exact location during an assumed unlawful arrest of a third party. In the case at bench, the officers learned nothing of the location of the defendants by the entry of the cabin. The most that they had was circum-

stantial evidence that appellants had been in the cabin where the laboratory was, and even this consisted only of evidence that goods belonging to them had been there. From the Wiggins search they did indeed obtain the MacPherson Street address, although even this somewhat indirectly. But they knew the approximate whereabouts of Wiggins, at least after he was arrested in Fort Bragg; they knew that a vehicle carrying suspected contraband had been headed toward Fort Bragg; and finally, they had even followed Aylwin and Champie to the very house because of information which they had received, not from any search, but from the personnel of the airline.

■ The point is made by appellants that only after the warrant had been obtained did affiant Filben receive information that officers had followed appellants to the MacPherson Street destination. There is no statement, of course, in the affidavit of the observations made by the officers in their following of Aylwin and Champie, but this does not invalidate the search. The affidavit for the warrant was fair on its face. It discloses no illegality. It does not show whether Wiggins would or would not have been able to make bail or what opportunity may have been afforded him to do so. It was necessary for appellants, therefore, to attack the affidavit by producing evidence, which indeed they did. But just as it was necessary for appellants to produce evidence dehors the affidavit, so it was allowable for the prosecution to give evidence of the inevitable discovery, which is peculiar to fruit of the poisonous tree cases and which in the nature of things ordinarily can be produced only by evidence outside the affidavit. The fact, therefore, that this evidence was not known to the affiant at the time he made the affidavit does not render the search made in pursuance of the affidavit illegal. The poisonous tree necessarily must be pointed out by the accused. The severance of necessary connection may then be shown by the People.

■ 2. In the second place, the coming upon the laboratory in the isolated cabin was pure happenstance, as were the stumblings on evidence in *Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 170, and *People* v. *McInnis,* 6 Cal.3d 821, 825 [100 Cal.Rptr. 618, 494 P.2d 690].

3. As in the *Lockridge* (at p. 171) and *McInnis* (at p. 825) cases, independent agencies were involved. The laboratory in the cabin was not discovered by officers connected with enforcement of the drug laws. Neither was the arrest and search of Wiggins.

4. Finally, to exclude the evidence obtained under the search warrant at South MacPherson Street on the ground that "the constable has blundered" (to borrow the piquant language of Judge Cardozo in *People* v.

*Defore,* 242 N.Y. 13, 21 [150 N.E. 585]) would be to destroy the results of massive and intelligent police work merely because of "blundering" of a deputy sheriff in Amador County (though we find no "blundering" at all, but rather, conscientious protection of property), and of officers at a jail house during a post-midnight confrontation with the driver of an erratically moving vehicle, whose actions, in part at least, were justified at that time by decisions of the Courts of Appeal.

The two purposes of the exclusionary rule, namely, deterring of officers from making illegal searches by depriving the prosecution of any profit therefrom, and the rejection of any gain by the state from its participation in the ignoble acts, would be ill served by suppression of the evidence in this case. The remoteness of the incidents from the major one and the fact that some of the acts were perfectly justifiable under the interpretation of the law which had been made by the courts, diminish, if they do not destroy, the effect of deterrence of wrongful police activity in the particular case at hand. The searches were not of such flagrant character, nor were they so connected with the search under warrant at MacPherson Street, as to corrupt the evidence obtained in pursuance of the warrant.

The trial court's ruling on the admissibility of the evidence was correct.

### Expert Opinion of Witness Hall

 Charles Hall, a chemist employed by the State Bureau of Narcotics Enforcement, testified that he found LSD within the MacPherson Street house. Appellants produced rebuttal witnesses who testified that no LSD was present in the flasks, but their analyses had been made some months later and there was expert testimony that LSD may degrade to a point where it is no longer identifiable. The conflict was resolved by the jury. Thus, count three of the indictment, possession of lysergic acid, in violation of section 11910 of the Health and Safety Code, must be sustained. As to count one, a conspiracy to commit the crime of manufacturing LSD, in violation of section 182 of the Penal Code, there was the testimony of Rodigou and Wiggins, who had become witnesses for the state, to sustain the charge of unlawful confederacy. The two overt acts alleged are the bringing into Mendocino County of chemical components to be used for the manufacture of LSD, and bringing into the county of laboratory equipment for that purpose. The witnessing of these overt acts having been testified to by independent percipient witnesses, very little, if any, expert testimony was required in order to sustain the conspiracy count. Appellants themselves did not testify.

In respect of count two, that charging attempt to manufacture LSD, in violation of section 11912 of the Health and Safety Code, the testimony of Hall was useful, if not necessary, in supporting the testimony of Rodigou. Appellants challenge the testimony of Hall, first on the ground that his opinion was based in part upon former defendant Rodigou's implicating statements to Hall, the admission of which violated their rights against self-incrimination. This contention lacks merit. █ The law is clear that a codefendant's implicating statement is admissible where said codefendant testifies at trial and is available for cross-examination. (*California* v. *Green,* 399 U.S. 149, 153-154 [26 L.Ed.2d 489, 494, 90 S.Ct. 1930]; *Nelson* v. *O'Neil,* 402 U.S. 622, 626 [29 L.Ed.2d 222, 226-227, 91 S.Ct. 1723].) In the case at bench, Rodigou testified at trial and was subjected to full cross-examination.

█ Appellants further challenge Hall's opinion on the ground that it was based on hearsay, that is, Rodigou's statements to Hall. Although it is true that Rodigou's testimony was subject to distrust because he was an accomplice, (a) this does not mean that Hall, an expert as distinguished from laymen such as jurors, could not reasonably rely upon Rodigou's statements about the manufacturing process under the provisions of Evidence Code, section 801, subdivision (b);[2] and (b) Hall's expert opinion was not automatically excluded, for where an expert opinion is based on proper as well as improper considerations, the admissibility of that opinion is within the discretion of the trial court. (*City of Gilroy* v. *Filice,* 221 Cal. App.2d 259, 271 [34 Cal.Rptr. 368]; *San Bernardino County Flood Control Dist.* v. *Sweet,* 255 Cal.App.2d 889, 902 [63 Cal.Rptr. 640]; Evid. Code, § 803.) Hall's opinion was based not only upon Rodigou's statements but also upon Hall's observation of the chemicals and equipment at 212 South MacPherson Street. Since a proper basis for the opinion existed independent of the improper basis the trial court did not abuse its discretion in admitting the opinion.

### *Variance Between Indictment and Proof*

█ The indictment charges that the LSD was manufactured on or about June 16, 1970. The trial judge properly realized that the evidence

---

[2]Evidence Code, section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: . . . (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

did not show a completed manufacture on that date and instructed the jury that it could not find appellants guilty on the charge of manufacture. But as to attempt to manufacture LSD, an included offense, there was of course some variance. But variance is not ground for reversal where the time is not a material ingredient of the offense. (Pen. Code, § 955.) The offense of attempt to manufacture LSD was a continuing one, and it is not important whether the laboratory was in full operation at the moment of the raid. There was no defense of alibi, a defense which of course makes the selection of time by the prosecution important. Appellants raise no point of the necessity of an election of dates, and although the Attorney General responds to a hypothetical raising of this point, we find it unnecessary to discuss it.

The judgments of conviction are affirmed.

Rattigan, J., and Bray, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 7, 1973.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.