[Crim. No. 32411. Second Dist., Div. Four. Mar. 22, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY FARLEY, Defendant and Appellant.

[Crim. No. 32901. Second Dist., Div. Four. Mar. 22, 1979.]

In re TERRY FARLEY on Habeas Corpus.

852

**COUNSEL**

Russell Iungerich, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Philip H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JEFFERSON (Bernard), J.**—By an amended information defendant was charged with three offenses. In count I he was charged with the murder (Pen. Code, § 187) of Sang Bong Park. In count II, he was charged with robbery (Pen. Code, § 211) of Park. In count III he was charged with robbery (Pen. Code, § 211) of Hwan Han Jong. In each count it was also alleged that, in the commission of the offense, defendant used a firearm—a revolver—within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).[1]

Defendant entered pleas of not guilty and denied the use allegations. Trial was by jury. Defendant was found guilty of murder of the first degree as charged in count I and guilty of robbery as charged in counts II and III. The robberies of both Park and Jong were found to be first degree robberies. With respect to all three offenses, the jury found to be true the firearm-use allegations. Probation was denied and defendant was sentenced to state prison for the term prescribed by law as to each count. The sentences as to counts II and III were stayed pending appeal and service of sentence as to count I. The stay was to become permanent at the conclusion of service of the sentence as to count I. Defendant has appealed from the judgment of conviction and has filed a petition for a writ of habeas corpus.

I

*The Factual Background*

The evidence tended to prove the following: On October 1, 1976, at approximately 7:30 p.m., Fields, aged 16, met defendant at 26th and Hooper Streets in Los Angeles. The two walked to the vicinity of a Shell gas station at Adams and Central and decided to rob the station upon its closing. Defendant gave Fields a loaded .38 caliber revolver and kept the same type of revolver for his own use.

At approximately 8:40 p.m., Park and Jong, who were the attendants at the gas station, started turning off the lights and closing various doors as part of the process of closing the station. Park walked out to his Volkswagen vehicle, which was parked by a gas island in front of the front office. Defendant and Fields approached Park. Defendant pointed

---

[1]Named as a codefendant in each count was Reginald Fields. Separate trials were ordered for the two codefendants.

his revolver at Park and grabbed Park by the collar. Defendant and Fields went through Park's pockets as the latter had his hands on the top of the roof of his vehicle.

Defendant then pushed Park into the lube bay portion of the station. Park began to scream. Jong, who was in the storage area, ran into the lube bay area. Fields ordered Jong into the back office where the cashbox was located. Defendant forced Park to lie down on the floor. Defendant held his revolver close to Park's head. Inside the back office, Fields, with his revolver pointed at Jong, forced the latter to open the cashbox. After Jong opened the cashbox, Fields took approximately $21 in bills and $6 to $7 in coins and put this money in his pocket.

As Fields was removing the money from the cashbox defendant's gun was fired. Fields saw Park bleeding from the head. Defendant and Fields then ran out of the gas station, down an alley and on 28th Street towards Central Avenue. Park was taken to the hospital and died the next morning as a result of extensive brain damage due to a penetrating gunshot wound to the head.

At the trial, Jong was unable to identify either Fields or defendant. Jong was able to describe the robbers generally as a shorter man, 15 to 16 years of age, and a taller man, 18 to 20 years of age. A Mr. and Mrs. Griffith (Joe and Brenda) stopped their car at the gas station to make a telephone call. They both observed some portions of the robbery and saw defendant and Fields run from the gas station. The Griffiths then drove their vehicle to 28th Street and Central Avenue and parked. Mrs. Griffith remained in the car and saw Fields and defendant run past her on 28th Street. Mr. Griffith, who got out of the vehicle, also observed the two men running down 28th Street. Mr. Griffith saw defendant go into a poolroom for a few seconds, exit, and follow Fields down 28th Street where they became lost from view.

At a vacant lot in back of buildings on 27th Street, defendant and Fields climbed a steel fence at a point where defendant lived in an apartment on 27th Street. Fields and defendant went first into defendant's apartment where the loot from the robbery was divided. After the money was divided, Fields and defendant ran down the driveway on to 27th Street. Virgie Weeks, 10 years of age, lived in an apartment in front of the defendant's apartment. She observed defendant and Fields climb the fence and heard a "jingling" sound from Fields' pocket, similar to that made by coin money. At the time of the fence climbing, a police

helicopter was flying overhead. Virgie saw defendant and Fields run "very fast" from defendant's apartment down the driveway past her. Fields ran across 27th Street and defendant down an alley.

Fields testified against defendant after entering a plea of guilty to second degree murder pursuant to a plea-bargain agreement. Defendant's defense was an alibi.

## II

### Contentions on Appeal

Defendant advances the following contentions on appeal: (1) that he was denied effective assistance of trial counsel; (2) that the trial court erred in holding that 10-year-old Virgie was competent to testify as a witness; (3) that the testimony of Virgie Weeks and evidence of her out-of-court statements constitute insubstantial evidence; (4) that there was a lack of corroborating evidence for the accomplice's testimony.

## III

### The Issue of A Denial of Effective Assistance of Trial Counsel

Defendant advances the contention that he was denied effective assistance of trial counsel because his trial counsel did not move (1) to suppress the in-court testimonial identification of defendant made by Joe and Brenda Griffith, and (2) to suppress the testimony of Reginald Fields on the ground that his testimony was the product of his illegal transportation, detention and arrest.

We start with a consideration of the legal principles involved in a determination of whether an indigent defendant has been denied his constitutional right to effective assistance of counsel. The ineffective assistance complained of must be of substantial proportion and, because of such ineffective assistance, the trial must have been reduced to a "farce or a sham." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

■ It is well established that an errorless trial is not required for effective assistance of counsel. ■ Equally extant is the principle that an unfortunate choice of trial strategy by defense counsel will not, in and

of itself, constitute an inadequacy that mandates a reversal of defendant's conviction. The rule was set forth in *People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64], that "[i]t is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions *cannot be explained on the basis of any knowledgeable choice of tactics.*" (Italics added.)

 A major tenet of the principle of constitutionally ineffective assistance of counsel is defined in terms of the attorney's actions or failures having the result of withdrawing from the trial the *adjudication* of a crucial defense. "It is counsel's duty to investigate carefully all defenses of fact and law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled." (*Ibarra, supra,* 60 Cal.2d 460, 464.) It is significant that the *Ibarra* court "does *not* hold that the 'adjudication' of which defendant has been deprived by the failure of counsel would result inexorably in a defendant's acquittal. It is the failure to have an appropriate *adjudication* of a defense that reduces the trial to a 'farce or a sham,'" and which thus renders a defendant's trial fundamentally unfair—in violation of the constitutional due process rights guaranteed to a defendant." (*People* v. *Rodriguez* (1977) 73 Cal.App.3d 1023, 1028 [141 Cal.Rptr. 118].) (Latter italics in original.)

In *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859], our high court discarded the *Ibarra* standard for ineffective assistance of counsel and declared that "a conviction may not be upheld if the state has furnished an *indigent* with representation of lower quality than that of a reasonably competent attorney acting as a diligent, conscientious advocate." (*Id.,* at p. 424.) (Italics added.) The *Pope* court imposed on a defendant-appellant the burden of proving a claim of inadequate trial assistance by showing "that trial counsel acted or failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*Pope, supra,* 23 Cal.3d 412, 425.)

 The *Pope* case also indicates that, if the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, and counsel was not asked for an explanation, the appellate court should not speculate on the explanation but should affirm the conviction, insofar

as the inadequate representation contention is concerned, and leave the determination of inadequacy of counsel representation to be made at an evidentiary hearing in a habeas corpus proceeding, unless the appellate court determines that there simply could not be a satisfactory explanation for trial counsel's actions or failures.

■■■ At defendant's trial, his attorney made a motion to exclude any in-trial identification testimony of Joe Griffith and Brenda Griffith on the ground that such testimony was tainted as the result of illegality flowing from an *impermissibly suggestive* pretrial photographic identification and pretrial lineup identification of defendant made by the Griffiths. This motion was denied. Thereafter, both of the Griffiths testified to an in-court identification of defendant and also to a pretrial photographic and a lineup identification of defendant as one of the two robbers of the gas station attendants and as the robber who had a gun pointed at Park, who died as a result of a gunshot wound.

It is defendant's contention before us that his trial counsel should have made a pretrial motion to suppress the in-court identification testimony of the Griffiths as being tainted by the illegal photographing of defendant resulting from his illegal transportation and his subsequent illegal arrest.

To assess the validity of this contention, we consider the circumstances leading up to the pretrial photographic identification of defendant by the Griffiths.

As of October 4, 1976, several days after the date of the offenses involved in the case before us, police officers had secured information which led them to suspect that defendant and Fields had committed the gas station robberies and murder. But this information was insufficient to constitute probable cause for an arrest. Thus, at the hearing on the motion which defense counsel made to prevent introduction of an inculpatory statement made by defendant at the time of his initial detention, Officer Furr testified: "We further had information from a James Smith who lives in the neighborhood that both Terry Farley and Reginald Fields had robbed the service station and that, in fact, Terry Farley had done the shooting." On the night of October 4, 1976, after securing this information, Police Officer Furr and his partner Jimmy L. Smith went first to the residence of Fields and saw Fields in front of his residence. According to the officers, Fields got into the police vehicle after he and his grandmother consented that he be taken to the police station for photographing. Then the officers saw defendant walking down

the street. They stopped him and asked his name. Defendant replied: "Terry Farley."

Officer Furr testified that he then said to defendant: "In essence it was that we were investigating a homicide which occurred at the service station; that we would like to talk to him in regards to it. We would like to take his photograph." According to Furr, defendant gave his consent to go to the police station for photographing. Defendant denied that he consented. At any rate, defendant got into the police vehicle with Fields and they were transported to the police station without being handcuffed.

At the station, defendant and Fields were photographed. Prior to this photographing, the officers had been photographing numerous young black males whom they saw in the neighborhood. The photographs of defendant and Fields, along with these photographs of other young black males, were then taken by a police officer to the home of the Griffiths. The Griffiths made a tentative identification of defendant's photograph. The officer returned to the station. Receiving a telephone call from the Griffiths, he went back to the Griffiths' home with the photographs. The Griffiths again identified the photographs of defendant and Fields. After the second visit to the Griffiths this same evening, the officer returned to the station and defendant and Fields were then placed under arrest.

█ Defendant asserts that, following his initial detention, his transportation to the police station and his detention there for the purpose of obtaining his photograph to be used in a photographic identification procedure for the Griffiths was an illegal transportation and detention, thus making his photographic identification by the Griffiths and his arrest thereafter and the subsequent lineup identification by them several days later, and their in-court identification testimony the fruit of the poisonous tree—all the product of an illegal transportation to the police station and detention there, which would have been suppressed had defense counsel made an evidence-suppression motion on this ground. Defendant relies primarily on *People* v. *Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632], and *Davis* v. *Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394]. The *Harris* court observed: "A detention of an individual which is reasonable at its inception may exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances." (*Harris, supra,* 15 Cal.3d 384, 390.)

In *People* v. *Courtney* (1970) 11 Cal.App.3d 1185, 1192 [90 Cal.Rptr. 370], the court observed: "We recognize that it is only in a rare case

where, absent probable cause for arrest, the removal of a suspect to a police station for further investigation is constitutionally permissible." In a similar vein, the *Harris* court remarked: "As a general proposition, despite defendant's urging, we are disinclined to hold that under no circumstances short of probable cause to arrest may an officer transport a suspect to another location for further interrogation or possible identification." (*Harris, supra,* 15 Cal.3d 384, 390.) In *Harris,* defendants, after an initial proper detention, were transported to the house of victims for possible identification as burglary perpetrators. They failed to make an identification but this was followed by further interrogation and inspection of the defendant's apparel which yielded identification of shoes and currency. The *Harris* court concluded that "[u]nder the facts of this case the officers' procedures violated defendant's constitutional rights. . . . It is a fundamental principle in our jurisprudence that an illegal police procedure cannot be justified by its fruits." (*Id.,* at pp. 391-392.)

In *Davis* v. *Mississippi, supra,* 394 U.S. 721 the nation's highest court declared that a detention for the purpose of obtaining fingerprints which were used at the suspect's trial constituted a violation of the Fourth Amendment right to be free of an unreasonable seizure of one's person. In so holding the court explained: "Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment." (*Davis, supra,* 394 U.S. 721, 727 [22 L.Ed.2d 676, 681].)

In the case before us, defendant was transported to the police station and detained there solely for the purpose of being photographed so that his photographs could be used in a photographic identification procedure. Is there any relevant distinction between a suspect's transportation to the police station and a detention there solely for such purpose and a transportation to the police station and detention there solely for the purpose of obtaining fingerprints condemned in *Davis* v. *Mississippi?* We think not. Although the *Harris* court indicated that there might be conceivable situations in which a transportation of a suspect from one location to another might be acceptable, there is no indication that a pre-arrest transportation to a police station for the purpose of taking photographs to be used for a photographic identification lineup would be considered a constitutionally permissible procedure. In view of *Davis* v. *Mississippi,* the *Harris* case cannot be interpreted to sanction a suspect's transportation to the police station for the sole purpose of obtaining photographs of the suspect even though the suspect's initial detention is proper because based on facts justifying a reasonable belief of criminal activity but which is insufficient to constitute probable cause

for an arrest. (*In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].)

■ The People assert that the transportation of defendant to the police station and his detention there for photographing was valid because defendant consented to it. We recognize that the *Harris* court gives its approval to the principle that a consent to prearrest transportation does not violate the constitutional prohibition against unreasonable seizure of the person. "Ordinarily there exists less intrusive and more reasonable alternatives to pre-arrest transportation. . . . In addition, the consent of the suspect may be sought." (*Harris, supra,* 15 Cal.3d 384, 391.) A consent to a prearrest transportation and detention constitutes a waiver of a constitutionally protected right just as is a consent to a search a waiver of such a right. (See *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218 [36 L.Ed.2d 854, 93 S.Ct. 2041]; *People* v. *Leib* (1976) 16 Cal.3d 869 [129 Cal.Rptr. 433, 548 P.2d 1105].)

■ When the prosecution relies upon a suspect's "consent" to a prearrest transportation and detention to justify what would otherwise constitute an invasion of a constitutionally protected right, and the suspect denies giving such "consent," the contested issue becomes one for determination by the court. We find a cogent statement of this principle in *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]: "[O]ne may waive his Fourth Amendment right to be free from unreasonable searches and seizures. [Citations.] However, it 'cannot be overly stressed that the protections embodied in the Fourth Amendment are so fundamental that they are to be jealously guarded and liberally construed.' [Citation.] 'It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." . . .' [Citation.]"

Thus, the People have the burden of proving—by a preponderance of the evidence—that a defendant did in fact give his consent and "that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority." (*People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) In every case the issue of whether defendant did in fact give his consent, and, if so, whether such consent was voluntary is "a question of fact to be determined in the light of all the circumstances." (*People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852].)

 In the instant case, the People correctly point out that the evidence on the issue of whether defendant consented to be transported to the police station to be photographed was disputed, with the police officers giving a version different from the version testified to by defendant. But this evidence was *not* introduced at any evidentiary admissibility hearing where *"consent"* was an issue. This evidence was introduced during a hearing on the admissibility of defendant's statement to the officers that he, the defendant, was not acquainted with Reginald Fields—an inculpatory statement made before there was any discussion between defendant and the officers regarding defendant's willingness or unwillingness to be transported to the police station for photographing.

It is significant that the trial court ruled only that defendant's inculpatory statement was admissible because made before any issue of transportation arose between defendant and the officers. The trial court did *not* rule on the issue of whether defendant had voluntarily consented to be transported to the police station for the purpose of being photographed, since defense counsel did not seek to exclude the in-court identification testimony of the Griffiths as being the fruit of the poisonous tree of defendant's illegal transportation for photographing and his illegal arrest as a consequence. As conceded by the Attorney General, "[s]ince the issue was not raised, the trial court specifically left open the question whether the transportation of appellant [defendant] to the police station was proper."

The record thus demonstrates that a key defense of defendant—the inadmissiblity of eyewitness identification testimony as being the fruit of an illegal transportation and detention—was not submitted to the trial court for determination. We thus are unable to apply the principle of law that "[t]he question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*James, supra,* 19 Cal.3d 99, 107.)

The fact that the trial court might have found in favor of the prosecution on the issue of whether defendant voluntarily consented to be transported to the police station for photographing does not solve the

problem of whether defendant was denied the constitutional right of effective assistance of counsel by reason of the failure of his counsel to raise the issue. Had the issue been presented to the trial court, that court might have chosen to believe defendant's version of his encounter with the police officers rather than the officers' versions, and decided the issue in defendant's favor. Although not presented with the issue of "consent" for determination, the trial judge gave some indication that he was inclined to believe defendant's version of "no consent" to the transportation. The trial judge stated: "I'm inclined to believe that Mr. Farley was simply told to come into the car . . . . I don't think he felt he could have refused to go with them." But what is of greater significance is the fact that a defendant is denied the effective assistance of counsel if, by reason of counsel's failure to perform the obligations imposed upon him, defendant is deprived of an *adjudication* of a crucial or potentially meritorious defense. It is not required that defendant establish that the adjudication would *necessarily* be in defendant's favor. "A crucial defense is not necessarily one which, if presented, 'would result inexorably in a defendant's acquittal.' " (*Pope, supra,* 23 Cal.3d 412, 425, fn. 15.)

Defendant also claims that he was denied effective assistance of counsel because his trial counsel did not move to suppress the testimony of Reginald Fields, the codefendant charged in the information with the same offenses charged against defendant. The issue of the legality of the transportation of Fields to the police station for the purpose of having his photograph taken for identification by the Griffiths is exactly the same as that issue has been discussed above in connection with defendant's transportation to the police station.

But does defendant have standing to raise the issue of the illegality of the officers' actions with respect to Fields? ■ California has adopted a broad application of the constitutionally based exclusionary rule which permits a defendant who is affected by an allegedly unconstitutional search, seizure or detention of another person to challenge its legality. (*People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].) Defendant in the case before us has "standing," therefore, to urge that the testimony of Fields was the product of illegal actions of the officers in transporting Fields to the police station for the purpose of having Fields' photograph taken and identified by the Griffiths as one of the perpetrators of the gas station robberies and murder.

The People urge, primarily, two points for their view that defendant was not denied effective assistance of trial counsel. It is suggested that

defense counsel's failure to make the suppression-of-evidence motions which defendant on appeal argues should have been made was the result of a choice of trial tactics. ▮ But we have searched the record in vain to find some answer to the question of why defense counsel failed to make the suppression-of-evidence motion which resulted in the withdrawal of a potentially meritorious defense. "*Ibarra* itself teaches that by failing to obtain an *adjudication* of the stronger of two potential defenses, trial counsel deprived his client of constitutionally adequate assistance." (*Pope, supra,* 23 Cal.3d 412, 425, fn. 15.) Our review of the record tells us that, even if defense counsel had been asked to provide an explanation for his failure to make the suppression-of-evidence motions discussed herein, there simply could be no satisfactory explanation. (See *Pope, supra,* 23 Cal.3d 412, 425.)

A second point urged by the People is that, had the trial court addressed the issue of the admissibility of the in-court identification testimony of the Griffiths on the basis that it was the product of defendant's and Fields' illegal transportation for photographing, a ruling would have been compelled that such testimony had an independent source and was freed of the taint of illegality. In *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407], the issue is stated to be " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

▮ But once an initial illegality has been established, the burden is on the prosecution to prove, by the *clear-and-convincing-proof* standard, that the objected-to evidence is free of the taint of the initial illegality. (*People* v. *Martin* (1970) 2 Cal.3d 822, 834 [87 Cal.Rptr. 709, 471 P.2d 29].) "[T]he admission of an in-court identification which has a source or origin 'independent' of the illegal pretrial confrontation [identification] is not error, whereas the admission of an in-court identification which is not shown to be 'independent' of such a confrontation [identification] is error of constitutional dimension and compels reversal unless shown to be 'harmless beyond a reasonable doubt' under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24. . . ." (*Martin, supra,* 2 Cal.3d 822, 831.) One means of meeting this burden is to establish that the information obtained illegally would have been discovered anyway by the police during the normal course of a lawfully conducted investigation. (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023]; *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474

P.2d 683].) ▮ Evidence that is subject to "inevitable discovery" is held admissible, regardless of the initial illegal manner of discovery. (*People* v. *Aylwin* (1973) 31 Cal.App.3d 826 [107 Cal.Rptr. 824].)

▮ The People assert that, in the instant case, the information already in the possession of the police regarding defendant and Fields and their possible connection with the gas station offenses was such as to lead inevitably to the Griffiths' identification of them as the perpetrators so that the trial court would be required to hold that Fields' testimony against defendant and the Griffiths' in-court identification testimony were purged of the taint of illegality. However, we are unable to conclude that, as a matter of law, had there been a hearing on the "independent source" and "inevitable discovery" rules, that the prosecution would have met its burden of proof on this issue by the clear-and-convincing-proof standard. The failure of defendant's trial counsel to make appropriate suppression-of-evidence motions precluded any hearing and determination by the trial court, and we cannot speculate what the trial court rulings would have been.

The fact that the Griffiths testified at trial that their in-court identification of defendant had a source independent of the pretrial photographic identification simply does not affect the issue. In *Martin, supra,* 2 Cal.3d 822, on a motion for new trial, the trial judge, for the first time, determined that a pretrial confrontation had been violative of *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], but that the in-court identification had had an origin independent of that confrontation because the victim had testified as to her specific observations at the time and place of the robbery charged against the defendant. But in rejecting the argument that the trial court had made a definitive ruling in favor of the in-court identification as having had an independent origin, the *Martin* court made the observation that "[w]e do not think that the trial court's consideration of the matter of independent origin on the motion for new trial was the legal equivalent of such consideration and determination *at trial.* . . . Clearly a quite different attitude is required when the court undertakes to determine and assess 'preliminary' or 'foundational' facts upon which the admissibility of evidence depends." (*Martin, supra,* 2 Cal.3d 822, 832.) (Italics added.)

▮ It is abundantly clear that, in light of *Martin,* defendant in the case before us was entitled to an adjudication, under the appropriate burden-of-proof standards, of the issues of (1) whether defendant had given a voluntary consent to his transportation to the police station to have his photograph taken for identification purposes; and (2) assuming a

finding that he had not given such consent, whether the Griffiths' in-court identification of defendant and Fields' testimony against defendant were the product of independent origins or inevitable discovery to dissipate the taint of illegality flowing from defendant's invalid transportation to the police station to have his photograph taken which resulted in the Griffiths' and Fields' testimony.

The failure of defendant's trial counsel to make the appropriate suppression-of-evidence motions and raise these issues constitutes a denial to defendant of his constitutional right to effective assistance of counsel. The violation of defendant's constitutional right to the effective assistance of counsel compels a reversal of the judgment of conviction so that defendant can be tried after crucial issues of the admissibility of evidence have properly been determined.

Since a new trial is necessary in the instant case, we turn to a consideration of other issues raised by defendant which could be of significance on a new trial.

## IV

### *The Competency of the 10-Year-Old Witness to Testify*

Defendant contends that the trial court abused its discretion in holding that Virgie Weeks, 10 years of age, was competent to testify. This witness was a reluctant witness. She was fearful and obviously didn't want to testify. Virgie's mother made it clear that she didn't want her daughter to testify—basically out of fear for the girl's safety. Although Virgie stated she knew the difference between telling the truth and not telling the truth, and that she would get a whipping if she did not tell the truth, she stated several times on the witness stand that she would *not* tell the truth. But she also said that she would tell the truth. Although it was a laborious undertaking, answers were elicited from Virgie to the effect that, on the evening of the gas station offenses, she saw defendant and Fields climb over the fence, with the sound of coin money jingling in Fields' pocket, and with Fields running across the street and defendant down an alley.

Evidence Code section 701 provides that a person is disqualified to be a witness if he is: "(a) Incapable of expressing himself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (b) Incapable of understanding the duty of a witness to tell the truth." ■ The burden of proof on the

issue of incompetency—that a person is incapable of understanding the duty of a witness to tell the truth—is upon the objecting party to establish this fact to the judge's satisfaction by a preponderance of the evidence. (Evid. Code, § 405.)

The fact of *capacity* of a person to understand the duty of a witness to tell the truth is a preliminary fact to competency of a person to testify as a witness. If the evidence on the issue of the *capacity* of a proffered witness to understand the duty of a witness to tell the truth is conflicting, the proffered witness must be held competent or qualified to be a witness unless the objecting party establishes, by a preponderance of the evidence, a *lack* of capacity. (See com. of Assem. Committee on Judiciary to Evid. Code, § 405.) ■ In the absence of a clear abuse of discretion the trial court's decision on the issue of competency to be a witness under Evidence Code section 701 will not be disturbed on appeal. (See *People* v. *Blagg* (1970) 10 Cal.App.3d 1035 [89 Cal.Rptr. 446]; *People* v. *Yarbrough* (1974) 37 Cal.App.3d 454 [112 Cal.Rptr. 391].)

In the case at bench, the evidence was conflicting and capable of divergent inferences regarding the "preliminary fact" of whether 10-year-old Virgie Weeks had the capacity to understand the duty of a witness to tell the truth. In light of such conflict, we must hold that the trial judge's ruling is supported by substantial evidence.

V

*The Testimony of the 10-Year-Old Witness
as Substantial Evidence and the Question of
Corroboration of the Accomplice's Testimony*

■ Defendant argues that the testimony of 10-year-old Virgie Weeks should be deemed lacking in substantiality and insufficient to corroborate the testimony of the accomplice, Reginald Fields. Although there were some inconsistencies in Virgie's testimony, and although there is no doubt that she and her mother were desirous of her not testifying at all, there is nothing inherent in Virgie's testimony or the surrounding circumstances which would cause her testimony to be lacking in solid value.

Defendant's contention that the accomplice's testimony was not corroborated as required by Penal Code section 1111 is manifestly lacking in merit. We need not further lengthen this opinion by reciting the evidence which meets the test of corroboration as set forth in *People* v. *Perry* (1972) 7 Cal.3d 756 [103 Cal.Rptr. 161, 499 P.2d 129].

In view of our disposition of the appeal, we deny the petition for a writ of habeas corpus.

The judgment is reversed.

Kingsley, Acting P. J., concurred.

Alarcon, J., concurred in the judgment.

A petition for a rehearing was denied April 10, 1979. Alarcon, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied May 17, 1979. Clark, J., was of the opinion that the petition should be granted.