Filed 5/15/25  P. v. Martinez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANNY GONZALO MARTINEZ,<br><br>Defendant and Appellant. | F085894<br><br>(Super. Ct. No. F22906963)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III and Gregory T. Fain, Judges.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez and Jesica Y. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Danny Gonzalo Martinez (defendant) was prosecuted for sexually abusing a child.  A jury found him guilty of violating Penal Code section 288.7.  (All undesignated statutory references are to the Penal Code.)  The issues on appeal do not require a

summary of the trial evidence.  For that reason, and to protect the privacy interests of witnesses, there will be little discussion of the underlying facts.

There are two claims in this appeal.  Defendant first alleges the People were allowed to refile charges against him after two prior dismissals without meeting the requirements of section 1387.1.  This claim fails on the merits.

Defendant's second claim is based on the allegedly deficient performance of his trial counsel.  "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation."  (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)  The record shows reasonable explanations for the conduct in question, so defendant's claim must be rejected.  We affirm the judgment.

## DISCUSSION

### I.     Prosecution After Two Dismissals

#### A.     Applicable Law

Felony prosecutions are subject to a "two-dismissal rule" set forth in section 1387. (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1019.)  Two dismissals of a criminal action, including voluntary dismissals under section 1385, generally preclude "any other prosecution for the same offense if it is a felony."  (§ 1387, subd. (a).)  "However, section 1387.1 gives the prosecution one more opportunity to pursue charges under these circumstances if the alleged offense is a violent felony and the prior dismissals were due to excusable neglect."  (*People v. Lomax* (2010) 49 Cal.4th 530, 557.)

A third filing of charges for a violent felony "is permitted where (1) either of the prior dismissals was 'due solely to excusable neglect,' and (2) the conduct of the prosecution did not 'amount[] to bad faith.'"  (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 739, quoting § 1387.1, subd. (a).)  The statute defines excusable neglect as including, but "not limited to, error on the part of the court, prosecution, law

2.

enforcement agency, or witnesses." (§ 1387.1, subd. (b).) A trial court's finding of excusable neglect is reviewed for abuse of discretion. (*Miller*, at p. 741.)

## B. Procedural Background

On October 20, 2022, defendant was charged by information with two counts of sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 1 & 2) and one count of oral copulation or sexual penetration of a child 10 years of age or younger (*id.*, subd. (b); count 3). The offenses were allegedly committed between March 2014 and March 2019, when defendant was between the ages of 26 and 31. All counts were violent felonies as defined by section 1387.1. (See §§ 667.5, subd. (c)(7), 1387.1, subd. (a).)

Following his arraignment, defendant moved to set aside the information based on the two-dismissal rule. The motion papers alleged defendant was previously charged with the same offenses in 2019 in Fresno Superior Court case No. F19904825 (F19904825), and again in June 2022 in Fresno Superior Court case No. F22903897 (F22903897). The motion was supported by transcripts from court proceedings during which those cases were ordered dismissed at the People's request.[1]

Defendant's principal argument, as stated in the written motion, was as follows: "Here, there was no neglect on the part of the prosecution, therefore there was no excusable neglect. The first dismissal was due to the prosecution being unavailable due

---

[1]According to the motion, all charges in F19904825 were for violations of section 288.7, subdivision (b). When refiled in F22903897, two of the original charges were changed to allege violations of section 288.7, subdivision (a). In a footnote, defendant's trial counsel acknowledged the distinction but argued "[a] violation of Penal Code §288.7(b) and a violation of Penal Code §288.7(a) are the same offense for purposes Penal Code §1387.1." Because the defense motion was appropriately denied on other grounds, we express no opinion on the merits of that argument. (See generally *People v. Juarez* (2016) 62 Cal.4th 1164, 1172 [noting § 1387 does not "automatically 'apply to all charges arising from the *same conduct or behavior* of the defendant'"].)

to a medical leave. The second dismissal was based off of a witness being unavailable due to health issues."

The People opposed the motion, relying on *People v. Massey* (2000) 79 Cal.App.4th 204 to argue that excusable neglect under section 1387.1 does not require actual negligence. Three sworn declarations were filed in support of the opposition.

The prosecutor who worked on the first case, F19904825, declared her request for dismissal was "due to a prescheduled surgery" that potentially conflicted with the trial schedule. Although not explained in the declaration, defendant had acknowledged the first dismissal was requested and granted a few days prior to the "time out date for trial." In the People's opposition brief, it was argued the prosecutor's "scheduled surgery … left her unavailable to try the case within the time period set for trial."

The prosecutor to whom the case was reassigned after the first dismissal declared the second dismissal was "due to the confidential victim (CV) being unavailable due to being treated at Central Star Youth Psychiatric Health Facility." The "CV" was in the psychiatric facility on September 27, 2022, which the parties agreed was the "time out date" for trial in F22903897. The prosecutor did not reveal when she learned of the witness's psychiatric commitment, but she claimed to have spoken with "CV's mother," as well as a victim advocate and "staff at Central Star" regarding the witness's availability. The prosecutor contacted the facility on September 26, 2022, i.e., the day before trial, and was told "there was no specific anticipated discharge date for CV and that it remained a medical necessity to have CV at the facility." [2]

A declaration from the Medical Director of Central Star Youth Psychiatric Health Facility verified that the complaining witness "was a patient at the facility from

---

[2] The prosecutor also identified a secondary reason for dismissing F22903897, but stated the dismissal would have been requested in any event due to the complaining witness's unavailability. It is therefore unnecessary to discuss the secondary explanation.

September 12, 2022 until September 29, 2022." The declaration also stated, "[D]uring that time, remaining at the facility was a medical necessity for [the witness]."

When the motion was heard, the trial court informed the parties of its reliance upon *People v. Massey*, *supra*, 79 Cal.App.4th 204. Quoting from *Massey* at page 211, the trial court explained the relevant holding: "'"[I]f the police and prosecution [have] done all that could be reasonably expected to locate their witnesses and get them to court, and yet not succeeded, then, so far as concerns the construction of Section 1387.1, their failure should still be labeled excusable neglect, despite the absence of any actual neglect, as commonly understood to include an element of carelessness or lack of sufficient regard or effort."'"

After quoting from *Massey*, the trial court stated its understanding of the opinion and issued its ruling: "So what they're basically saying is that excusable neglect doesn't mean what it says. It may sound nonsensical but the *Massey* case indicates that no neglect is actually required. … I may not agree with it, but I have to follow the case law from the Appellate Court that is provided to me. If [the defense has] anything that is contrary to that, I'll be more than willing to consider it, but that is what [this court] finds and I think that is the appropriate ruling. [¶] The Court, therefore, is going to respectfully deny the request to dismiss [the charges]."

The case proceeded to trial. In December 2022, a jury found defendant guilty on counts 1 and 3. The jury hung on count 2, i.e., the second of two alleged violations of section 288.7, subdivision (a), and the charge was later dismissed at the People's request.

In March 2023, defendant was sentenced to mandatory prison terms of 25 years to life (§ 288.7, subd. (a)) and 15 years to life (*id*., subd. (b)), which were ordered to be served consecutively (§ 669, subd. (a)). Defendant filed a timely notice of appeal.[3]

---

[3]Due to numerous extension requests, the appellate briefing was not completed until October 2024. Subsequently, after waiving oral argument, defendant's appellate counsel made a

5.

### C. Analysis

"Section 1387.1 is a remedial tool designed to save serious felony prosecutions from improvident loss where there is no bad faith on the part of the prosecution and the inability to prosecute the action is due to excusable neglect." (*People v. Massey*, *supra*, 79 Cal.App.4th at p. 212.) "[T]he policy favoring trial on the merits must prevail unless there is clear *inexcusable* neglect." (*People v. Turner* (2023) 97 Cal.App.5th 568, 574.) We imply all necessary factual findings and "'draw every legitimate inference in favor of the [trial court's] ruling." (*Miller v. Superior Court*, *supra*, 101 Cal.App.4th at p. 740; see *People v. Woods* (1993) 12 Cal.App.4th 1139, 1157.) "[P]roof by a preponderance of the evidence is sufficient to establish the section 1387.1 exception." (*Miller*, at p. 748.)

There are no allegations of bad faith in this case. Defendant contends "the prior dismissals were not the result of excusable neglect," but he offers nothing in the way of substantive argument to support his claim. The People devote eight pages of the respondent's brief to refuting this claim, but defendant does not even mention the claim in his reply brief.

In his opening brief, defendant states he "respectfully disagrees with the [trial] court's reading of *Massey* that 'no neglect is actually required.'" He then notes the dismissal in *Massey* "was the result of 'excusable neglect.' The 'neglect' under section 1387.1 was the failure of the People to have the witnesses in court on the date set for the first trial.'" (Quoting *People v. Massey*, *supra*, 79 Cal.App.4th at p. 211.)

Defendant is correct insofar as the trial court's statement, when viewed in isolation, is not accurate. Section 1387.1 does require neglect, but neglect is broadly defined in this context. As defendant recognizes, the "neglect" in *Massey* was a failure to secure the presence of witnesses despite a finding of "diligence" on the part of the

---

special request for this court to delay issuing a decision until April 2025 or later. The unopposed request was granted.

6.

prosecution and police. (*People v. Massey*, *supra*, 79 Cal.App.4th at p. 211.) The trial court's stated understanding of *Massey* was, for all practical purposes, on point.

In *Massey*, the People voluntarily dismissed a murder case on the date set for trial because multiple eyewitnesses were unavailable. (*People v. Massey*, *supra*, 79 Cal.App.4th at pp. 207–208.) To justify the subsequent filing of charges for a third time under section 1387.1, the People elicited testimony from a detective assigned to the case. "He stated there were 14 witnesses to the murder, he had contacted all of them, they were initially all cooperative with police, and many identified [the accused] from a photographic lineup. He stated that as time went on, however, he had difficulty contacting the witnesses or their family members. … He attempted at least 12 times to locate witnesses prior to trial on the first filing without success, and stated on two occasions he was told the witnesses were avoiding him. He stated he ultimately was unable to serve subpoenas on anyone for the first trial." (*Massey*, at p. 208.)

The issue in *Massey* was whether "excusable neglect" could be found under section 1387.1 when there was no actual negligence or lack of diligence. The appellate court agreed with the People "that 'if the police and prosecution had done all that could be reasonably expected to locate their witnesses and get them to court, and yet not succeeded, then, so far as concerns the construction of section 1387.1, their failure should still be labeled *excusable neglect*, despite the absence of any actual *neglect*, as commonly understood to include an element of carelessness or lack of sufficient regard or effort.'" (*People v. Massey*, *supra*, 79 Cal.App.4th at p. 211.) In other words, "the absence of negligence" does not necessarily "take the case out of section 1387.1." (*Ibid.*) There was a "finding of diligence" by the *Massey* trial court regarding the effort to produce key witnesses for trial, which the appellate court construed as "equivalent to a finding of excusable neglect under section 1387.1." (*Ibid.*)

Defendant does not argue *Massey* was wrongly decided. He merely contends, without further explanation, that the present case is distinguishable. We acknowledge

7.

there are factual distinctions, but they are not material. The basic holding of *Massey* governs the issue of excusable neglect. That holding has been followed in other appellate decisions, e.g., *Miller v. Superior Court*, *supra*, 101 Cal.App.4th 728 and *People v. Mason* (2006) 140 Cal.App.4th 1190. The facts of *Mason* are sufficiently analogous to the circumstances resulting in the dismissal of F22903897, i.e., the second dismissal of charges against defendant herein.

In *Mason*, the issue was whether "the prosecution's inability to produce [the complaining witness] for trial" resulted from excusable neglect within the meaning of section 1387.1. (*People v. Mason*, *supra*, 140 Cal.App.4th at p. 1196.) The complaining witness "had cooperated fully with the prosecution" while the case was pending and had last communicated with "the prosecutor's witness coordinator" 16 days prior to trial. (*Id.* at pp. 1196, 1195.) However, the witness was apparently unaware of the trial date and was out of the country on business when the trial began. The opinion suggests the prosecutor did not learn of the witness's unavailability until after jury selection had commenced. The prosecutor informed the judge of the People's inability to proceed on the second day of trial. (*Id.* at p. 1195.) The *Mason* court upheld a finding of excusable neglect, observing "[i]t was through no fault of [the prosecutor] that the trial could not [proceed]." (*Id.* at pp. 1196–1197.)

Here, the complaining witness was in a psychiatric facility for a two-week period leading up to, and including, the "time out date" for trial in F22903897. The witness was unavailable, and there was nothing the prosecutor could have done to change those circumstances. The prosecutor was impliedly found to have made reasonable efforts to secure the witness's trial attendance, including contacting the psychiatric facility to determine if there was an anticipated date for the witness's release (there was not). Under *Massey* and its progeny, the trial court's ruling was not an abuse of discretion. (*People v. Massey*, *supra*, 79 Cal.App.4th at p. 211; see *Miller v. Superior Court*, *supra*,

8.

101 Cal.App.4th at p. 741 ["A reviewing court cannot disturb an exercise of discretion unless it is 'arbitrary, capricious, or patently absurd'"].)

"The 'neglect' under section 1387.1 was the failure of the People to have the [complaining witness] in court on the date set for the [second] trial." (*People v. Massey*, *supra*, 79 Cal.App.4th at p. 211.) The evidence does not show the prosecution's neglect was clearly "*inexcusable*." (*People v. Turner*, *supra*, 97 Cal.App.5th at p. 574.) Because the statute requires only one of the prior dismissals to have been due to excusable neglect, it is unnecessary to consider whether the dismissal of F19904825 (attributed to the prosecutor's "prescheduled surgery") was also the result of excusable neglect. (§ 1387.1, subd. (a); *Massey*, at p. 212; e.g., *Turner*, at p. 572 & fn. 3.)

## II.     Alleged Ineffective Assistance of Counsel

### A.     Overview

Defendant's claim of ineffective assistance of counsel (IAC) is based on his trial counsel's alleged misunderstanding of a motion in limine ruling. The claim rests on a false premise, but understanding the fallacy requires a firm grasp of the procedural background. The relevant proceedings will be summarized in detail.

In essence, defendant purports to believe the trial court ruled that evidence concerning the victim's mental health would be admissible without specific limitations requested by the prosecutor. Defendant's trial attorney is thus alleged to have rendered IAC by failing to ask certain questions while cross-examining the victim. What actually happened is the trial court placed conditions upon certain areas of inquiry, and the contingent circumstances apparently never materialized.

Although the trial court's ruling was slightly ambiguous, it was certainly susceptible of being understood in the way defense counsel apparently interpreted it. As will be seen, defense counsel's interpretation was arguably more reasonable than the one now proposed by defendant. Any competent defense attorney could have interpreted the

9.

ruling the same way as his trial counsel did, which precludes a finding of IAC on direct appeal.

Defendant makes a secondary IAC claim based on the failure to present an alternative defense theory. Trial counsel argued the victim knowingly lied about the allegations of sexual abuse. Defendant faults the lawyer for not alternatively contending the victim truly believed the abuse occurred, but it was a false belief attributable to mental illness. Although defendant labels the second theory as "complementary" to the first, a competent defense lawyer could reasonably disagree or have strategic reasons for not arguing both theories. It is settled that "counsel does not render ineffective assistance by choosing one or several theories of defense over another." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007.)

### B.    Relevant Background[4]

The victim has a history of mental health issues, including self-reported experiences of visual and auditory hallucinations. At the preliminary hearing, which took place approximately eight weeks before trial, the victim testified about her recent psychiatric hospitalization (discussed in the previous section of this opinion) and current medications. Those medications reportedly included lithium, which the victim understood to be a "mood stabilizer," and "Abilify … for hallucinations."

The victim testified to doubting the efficacy of the medicine: "I don't think it's working." She claimed to hear voices inside her head, even while testifying on the

---

[4]The victim in this case was born a biological female and identified as such between the ages of 6 and 11, i.e., the period during which the crimes were committed. At the preliminary hearing, when the victim was 14 years old, the victim used a self-described "gender neutral" name and alluded to identifying as a nonbinary person. The preliminary hearing was conducted two months before the trial. The record contains limited and not entirely consistent indications that at the time of trial, the victim identified as male and was using male pronouns. The victim was not asked about this during any of the reported trial proceedings. Both parties on appeal refer to the victim using female pronouns (she/her). For the sake of consistency, and because the record does not conclusively disclose the victim's preferred gender pronouns at the time of trial or now, we do the same.

witness stand. The victim described the voices as being those of 27 different "imaginary friends."

The prosecutor and defense counsel both filed motions in limine regarding the victim's mental health. The defense motion consisted of two sentences: "Defense requests a 402 hearing to determine if [the victim] is competent to testify[.] [¶] This request is based off of several things, including a statement in her mdic about having imaginary friends, a history of 5150's, and [the victim] self-reporting that she hears voices." The letters "mdic" referred to an investigatory interview from three years earlier. The numerical references presumably meant Evidence Code section 402 and Welfare and Institutions Code section 5150.

The People's motion in limine, labeled as number 10 of 12, was presented under the heading, "Exclude CV's Mental Health Records, Evidence, and Testimony." (Boldface omitted.) As previously indicated, the prosecutor referred to the victim as "CV" in documents filed with the trial court. The People's motion in limine No. 10 read, in relevant part, as follows:

> "The People are in possession of and have provided to defense CV's mental health records, specifically 16 pages of treatment records from 2021 from County Behavioral Health and several [Welfare and Institutions Code section] 5150 police reports. The People are also aware from contact with CV and family, and CV's testimony at a prior competency hearing and at preliminary hearing that CV experienced hallucination during at least one prior (uncharged) incident of sexual conduct by Defendant [citation]; that CV hears voices, but the voices do not direct CV what to say; [citation]; and that CV takes psychiatric medication [citation]. [¶] …[¶]

> "Evidence regarding CV hallucinating during the time(s) these assaults are alleged would be the proper subject of inquiry, as that goes to CV's ability to perceive during the relevant time period. However, testimony regarding currently being medicated, being in therapy, mental health diagnoses, and 5150 holds is unduly prejudicial and has no probative value." (Fn. omitted.)

The motions in limine were heard on the first day of trial, beginning with the People's requests. The trial court made the following prefatory remarks about the subject motion (paragraph breaks added for readability):

"… So let's handle motion 10, defense and People's motion 10. The People are seeking to exclude in part testimony about CV's mental health. And as it occurred to me, there were a couple of areas that I wanted to comment on generally, and how I handle these things. I thought I could use it as a starting point and go from there."

"If the issue is pertaining to a victim's mental health or breakdowns at or near the time of the allegation, that often is very—the Court finds that to be more probative and does allow it."

"If it pertains to the alleged victim's use of any medications or substances at or near the time of the event, I generally allow that too because that obviously pertains to the victims ability to—alleged victim's ability to perceive, recollect, and recall the incident."

"If it pertains to the use of medications at the time the person is testifying, I usually let that in too because again it has a bearing on the witness' testimony. Unfortunately over the past year I had two trials where witnesses came in and were using substances, and it was definitely fair game for the defense to go into that. You could tell they were using, the jury could tell, but you know, it's fair game. Those three areas I think it's always—it's always pretty pertinent."

It will be important to remember the trial court's anecdote about presiding over trials where witnesses exhibited outward signs of altered mental status. The trial court would later reference those cases in an explanatory context while ruling on the People's motion.

As the hearing progressed, defense counsel narrowed the issues to be decided. The following exchange is pertinent to the claim of IAC:

"[DEFENSE COUNSEL]: … I have no intention of asking about any diagnosis, any medication. … However at the preliminary hearing I think almost every day that [the victim] testified I did ask her if [she] was currently hearing voices and [her] answer was always, Yes, I'm hearing 27 voices right now. So I think I asked that maybe three times.

12.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: And so I am asking to ask that question.

"THE COURT: Yeah. You see *if it's pertinent to what you're seeing and what the witness' answers are on the witness stand*, I would think that's very fair game. Like I allowed Defense Counsel [in the aforementioned cases] to cross-examine those people who appear under the influence very vigorously, and it was appropriate. I would think as to the present mental state at the time of the testimony those questions would be relevant. I tend to think the People are right as far as the 5150 reports, the mental health reports. I agree with you and I agree with the People, those shouldn't come in unless there's a specific—unless we discuss it outside of the presence of the jury and there's some specific relevant reason it comes up during the course of the trial. So I'm gonna grant 10. I do think the defense is right, *if there are things that come up during the course of the testimony about*, *you know*, *if she's saying she's having a rough time or she appears to be under the influence*, I think it's fair game." (Italics added.)

Next, the prosecutor made the following statements: "I think we agree on most of this, and especially [the victim] talking about hallucinating during some of the relevant time periods. I recognize that is absolutely relevant. The voices, hearing voices currently, based upon the preliminary hearing testimony I don't believe that would be relevant. The victim testified to hearing voices, but they do not direct the victim what to say, so that was addressed. And also I believe [defense counsel] asked if [the victim] was still able to, despite that going on, hear the questions and answer them without trouble and [the victim] did indicate she was still able to do that."

At this point in the hearing, the exclusive focus was on whether the defense would be permitted to ask the victim about currently hearing voices in her head. The following exchange took place:

"THE COURT: Okay. But wouldn't that be part of the give and take of the direct and cross-examination of that witness as opposed to the Court's ruling on barring questions about that area[?]

"[PROSECUTOR]: As in if the issue begins to present itself during— oh, I agree.

13.

"THE COURT: Yeah.

"[PROSECUTOR]: That is—I just didn't want that to be inquired into without there being something that the witness is doing or displaying or some behavior that would lead to inquiries about that.

"THE COURT: What about if defense is using a preliminary hearing transcript for some sort of impeachment issue on that issue?

"[PROSECUTOR]: I think if the witness is testifying and it appears that the witness is hearing voices and responding to those, that it is interfering with the witness' testimony, then asking about that and asking about any prior statements in the prelim would be fair game."

The above excerpt preceded a final colloquy between the trial court and defense counsel, followed by the trial court's final explanation of its ruling on the People's motion. As indicated, the trial court had already granted the motion and the prosecutor had essentially sought to clarify or confirm the circumstances under which questioning the victim about presently hearing voices would be allowed. The prosecutor clearly argued for a prohibition against such inquiries absent outward signs the victim was "hearing voices and responding to those" on the witness stand, and/or "that it [was] interfering with [her] testimony." This is what followed:

"THE COURT: All right. And what do you think, [defense counsel]? How would you like me to articulate or rule on this?

"[DEFENSE COUNSEL]: Well, I will add something from my recollection of the preliminary hearing, which is that the voices that she was currently hearing were also brought up when she was talking about, what I'll refer to as, the nail polish incident, so I don't know if that just came up under the topic of her hearing voices, but when she was talking about she—at some point she made reference to having had hallucinations via the imaginary friends in the past.

"THE COURT: Right.

"[DEFENSE COUNSEL]: So that came up.

"THE COURT: I believe to a certain degree that would be fair game. It's hard to limit, you know, if it's—if somebody is—there would be some relevancy, in my mind, that if someone is having mental health issues and

14.

there's hallucinations that could be related to it on or near the time of the incident, but I think that's fair game. That's kind of where you're going with that. Or, if she's having—you know, if it's at or near the time of the incident, as we are here on the witness stand, which we see strange things on that witness stand and hear a lot of strange things, I think those are all fair questions. I think beyond that, you know, it just pertains to, like I said, references to records, her mental health issues, and her diagnosis, I don't see the relevance of that. So I think that's about the best I could do with your motions is to give that guidance in that way."

Following the above-quoted exchange, the trial court addressed defendant's motion regarding the victim's competence to testify. The request for a competency hearing was granted pursuant to Evidence Code section 701.

The competency hearing took place on the fifth day of trial, outside the presence of jurors. It began with the victim answering a brief series of questions from the prosecutor to establish the victim's understanding of the difference between truth and lies. As earlier noted, the victim was 14 years old at the time.

The relevant questioning by defense counsel, and the victim's responses, were as follows:

"Q … I want to just ask a couple questions that I asked at the last hearing which was about hearing voices. Are you hearing voices today?

"A Yes.

"Q Okay. I'm just going to ask a couple questions. Are you hearing them while we're in court right now?

"A Yes.

"Q And is it more than one voice or just one voice?

"A More than one.

"Q More than one. Do you have—do you know how many?

"A Twenty-four.

"Q Twenty-four. So just so I know, so right now as I'm talking to you, can you hear the voices at the same time that I'm talking to you?

15.

"A  Yes.

"Q  Are you able to separate my voice and what I'm asking you from the 24 other voices?

"A  Yes.

"Q  Okay.  And those 24 other voices, are they in any way telling you how to answer questions?

"A  No.

"Q  No.  Are you—for those 24 voices, does it come out like just as a sound, or are you hearing distinct thoughts?

"A  Distinct thoughts.

"Q  Okay.  Besides hearing voices today, are you seeing—do you know what the word 'hallucination' is?

"A  Yes.

"Q  So today, are you seeing hallucinations?

"A  Not at this moment.

"Q  Okay.  Have you seen them today at all?

"A  No.

"Q  In terms of today and hearing of the voices, does it make it hard for you to answer questions?

"A  No.

"Q  No.  Okay.  And does it—in terms of the voices, does it make it hard for you in any way today to tell the difference between what's really happening and what you think—what you imagine is happening?

"A  Can you elaborate?

"Q  With the voices that you are hearing today, can you tell the difference between right now reality and stuff being fake?

"A  Yes.

16.

"Q  Okay.  *At any point, if you think that the voices today are affecting you, can you like just wave your hand so we can talk about it in private and let us know?*

"A  Okay.

"Q  Okay.  I have no other questions."  (Italics added.)

The trial court found the victim was "very clearly competent to testify."  After making this finding, the trial court announced a 10-minute recess.  The victim's trial testimony followed immediately thereafter.  The timing is important because there is nothing in the record to indicate the victim ever "waved [her] hand," as defense counsel had asked her to do if she felt the voices were affecting her on the witness stand, nor any other indications the victim showed outward signs of altered mental status during her testimony.

On direct examination, the prosecutor preemptively elicited testimony about an alleged instance of sexual abuse preceded by the victim "thinking or dreaming about three imaginary friends and nail polish."  The victim testified, "I might have been hallucinating, or I'm not really sure."  This was generally consistent with the victim's preliminary hearing testimony, though at the preliminary hearing the victim had expressed more confidence that the part involving the imaginary friends was a dream.[5]

The victim answered "Yes" when the prosecutor asked if she "sometimes experience[s] hallucinations."  The victim testified the hallucinations began when she was in fourth grade.  All testimony regarding "hallucinations" was impliedly in reference to visual, rather than auditory, hallucinations.  The victim testified to being unable to distinguish between reality and nonreality when she hallucinated, and she maintained her allegations of sexual abuse by defendant were "things that actually happened."

---

[5]In the victim's preliminary hearing testimony, she also indicated the "nail polish incident" was the "first time and the only time" she saw those "imaginary friends."  She estimated the incident occurred when she was 6 or 7 years old, and explained those "imaginary friends" were of a different type than the "imaginary friends" in her life from approximately fifth grade to the present.

17.

Defense counsel's cross-examination of the victim comprises approximately 110 pages of the reporter's transcript. Counsel only briefly inquired about the victim's hallucinations. The following exchange is representative of the relevant testimony:

"Q Okay. I wanted to ask about—I'm going to call it the nail polish incident.

"A Okay.

"Q And so let me know if I have this right. I heard that when [the prosecutor] was asking you questions that you had imaginary friends that you were talking to about nail polish?

"A Yes.

"Q So I have that right?

"A Yes.

"Q And so, are imaginary friends—are they the same, or are they different than when you were talking about hallucinations?

"A Sorry.

"Q That's okay.

"A Yeah. Yeah, um, I'm not really sure if it was a hallucination or if it was anything or just dream. I'm not really sure.

"Q Okay. And that was going to be my next question. If—is it possible that you were asleep and having a dream about nail polish. Is that—

"A That's possible too. I'm not really sure what was happening.

"Q Okay.

"A Not too familiar if it was a hallucination or if it was just a dream."

The prosecutor had not asked the victim about hearing voices, nor had the victim said anything about auditory hallucinations, so there was no testimony on the topic that would have been subject to cross-examination. Defendant's trial counsel did ask one

18.

question about the voices, but with regard to the "MDIC" interview conducted years earlier, during the victim's "summer break after fifth grade." The testimony was as follows:

> "Q Okay. In the 5th grade, I've heard you—you talked about hallucinations. In the interviews that you had with [the forensic interviewer] on that day, were you having any type of hallucinations?
>
> "A I think so.
>
> "Q Okay. What makes you say that?
>
> "A Because 5th, 4th and 3rd grade are basically where the hallucinations started.
>
> "Q Okay. But on that specific day with [the forensic interviewer]—
>
> "A Oh, I don't know.
>
> "Q What about hearing voices that day when you were being interviewed by [her]?
>
> "A I don't know."

In closing argument, defendant's trial counsel focused on evidence of the victim's history of lying and the lack of any physical evidence supporting the victim's allegations. The victim had accused defendant of having sexual intercourse with her beginning when she was in kindergarten and continuing with regularity until she made her accusations in fifth grade, but there was no corroborative physical evidence. The victim's own mother had admitted to police that the victim "lies a lot." Defendant's trial counsel also focused on evidence the victim had searched for, and viewed, online pornography during the same general time period as when she made her accusations against defendant.

## C. Defendant's Request for Judicial Notice

Three weeks after the respondent's brief was filed in this appeal, defendant filed a request for judicial notice. Defendant asks this court "to take judicial notice of the facts that defense counsel misunderstood the trial court's in limine rulings, should have asked

19.

before the jury and introduced into evidence the complainant's hearing 24 voices simultaneously, and there was not a tactical reason for not introducing the evidence." The request is supported by a declaration from defendant's trial counsel, which consists of two paragraphs. Trial counsel declares:

> "1. I am the attorney who represented [defendant] at trial in *People v. Martinez*, Fresno County No. F22906963, [appellate case No.] F085894.

> "2. During the course of the complainant's competency hearing outside the jury's presence, she testified under oath that she was then hearing 24 separate voices simultaneously. The complainant's sworn testimony of 24 separate voices being heard simultaneously was not introduced into evidence before the jury. I should have asked before the jury and introduced into evidence the complainant's hearing 24 voices simultaneously. I misunderstood the trial court's in limine rulings. There was not a tactical reason for not introducing the complainant's simultaneous hearing 24 separate voices into evidence. [*Sic*.]"

The People oppose the request for judicial notice. The opposition argues defendant's request is procedurally improper. We agree, and we further observe that the purported "facts" are not judicially noticeable under any circumstances.

The scope of a direct appeal is limited to the record of the proceedings from which the appeal is taken. (*People v. Bean* (1988) 46 Cal.3d 919, 944.) "'[A]n appellate court generally is not the forum in which to develop an additional factual record ….'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 952–953.) "A habeas corpus proceeding, of course, appropriately may develop a record beyond the record on appeal." (*Id*. at p. 953.) Accordingly, a defendant "who claims to have been denied constitutionally adequate assistance of counsel, and who relies on matters outside the record, or makes claims that can be resolved only by reference to matters outside the record, may seek relief through a collateral attack on the judgment by petition for writ of habeas corpus." (*Bean*, at p. 944.)

The Evidence Code requires appellate courts to take judicial notice of certain material (*id*., § 459, subd. (a)) and permits judicial notice of certain other material (*id*.,

20.

§ 452).  Defendant's request does not fall into either category.  First, "'[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances."  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)  Second, "even if a reviewing court takes judicial notice of documents, it is not for the truth of matters asserted therein."  (*Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307.)  The rule against judicially noticing documents for the truth of their contents includes assertions made in affidavits and declarations.  (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 12; *Lockley v. Law Office of Cantrell*, *Green*, *Pekich*, *Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.)  "[S]uch matters are reasonably subject to dispute and therefore require formal proof."  (*Lockley*, at p. 882; see *Garcia v. Sterling* (1985) 176 Cal.App.3d 17, 22 ["Although the existence of statements contained in a deposition transcript filed as part of the court record can be judicially noticed, their truth is not subject to judicial notice"].)

"The underlying theory of judicial notice is that the matter being judicially noticed is a law or fact that is *not reasonably subject to dispute*."  (*Lockley v. Law Office of Cantrell*, *Green*, *Pekich*, *Cruz & McCort*, *supra*, 91 Cal.App.4th at p. 882; see Evid. Code, §§ 451, subd. (f), 452, subd. (h).)  The bare assertion by defendant's trial counsel that she "misunderstood the trial court's in limine rulings" is neither undisputed nor irrefutable.  Counsel does not identify the particular "rulings" or explain how she misunderstood them.  The trial court's ruling on the People's motion in limine No. 10 included ambiguous statements, and the only person who knows for sure what the ruling meant is the trial judge.  It is entirely possible, and arguably likely, that defendant's trial counsel did *not* misunderstand the ruling.  As such, and for all the reasons discussed, defendant's request for judicial notice is hereby denied.

### D. Law and Analysis

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial …." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691–692.) Reviewing courts "'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' [Citation.] Accordingly, a court must 'view and assess the reasonableness of counsel's acts or omissions … under the circumstances as they stood at the time that counsel acted or failed to act.'" (*In re Scott* (2003) 29 Cal.4th 783, 811–812.)

"Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented." (*People v. Arce* (2014) 226 Cal.App.4th 924, 930; see *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 ["It is rarely appropriate to resolve an [IAC] claim on direct appeal"].) Defendants who present such claims bear a "heavy burden." (*People v. Garcia* (2022) 76 Cal.App.5th 887, 900). "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," the claim "must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

Defendant's first IAC claim rests on the assumption the trial court ruled to allow, without restrictions, questioning the victim about currently hearing voices in her head. In other words, defendant purports to interpret the ruling as a rejection of the prosecutor's argument for such inquires to be prohibited absent outward indications that hearing the voices was "interfering with" or otherwise affecting the victim's testimony. The record

does not clearly support defendant's assumption. At best, the trial court's ruling was ambiguous. The ambiguity does not assist defendant, however, because the trial court's statements are reasonably interpreted as a ruling in favor of the People.

Defendant's interpretation of the subject ruling would render as superfluous all of the trial court's statements about the victim's presentation on the witness stand. When defense counsel requested permission to ask the victim about hearing voices, the trial court responded, "Yeah. You see if it's pertinent to what you're seeing and what the witness' answers are on the witness stand, I would think that's very fair game.…" At the conclusion of its response, the trial court said, "I do think the defense is right, if there are things that come up during the course of the testimony about, you know, if she's saying she's having a rough time or she appears to be under the influence, I think it's fair game." In subsequent remarks, the judge again described potential scenarios of the victim exhibiting unusual behavior:

> "Or, if she's having—you know, … as we are here on the witness stand, which we see strange things on that witness stand and hear a lot of strange things, I think those are all fair questions. I think beyond that, you know, it just pertains to, like I said, references to records, her mental health issues, and her diagnosis, I don't see the relevance of that."

If the trial court was ruling to allow the questioning without conditions or limitations, why would it not have simply granted the request? Why repeatedly describe hypothetical scenarios in which hearing the voices appeared to be affecting the victim's ability to testify? Defense counsel evidently understood the court to be placing conditions on this area of inquiry, which explains why the lawyer asked the victim to "just wave your hand" if at any point the victim felt the voices were "affecting" her.

"'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.'" (*People v. Anderson*, *supra*, 25 Cal.4th at p. 579.) "Of course, the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, *if* such

illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592, italics added.) Thus, from both a legal standpoint and based on the trial court's statements, there is a conceivable, reasonable explanation for defense counsel's failure to question the victim about currently hearing voices in her head.**6**

"If the record contains an explanation for the challenged aspect of counsel's representation, the reviewing court must determine 'whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.'" (*People v. Osband* (1996) 13 Cal.4th 622, 700.) Here, the record indicates defendant's trial counsel reasonably interpreted the trial court's ruling as conditioning certain questions upon how the victim presented on the witness stand. In other words, upon outward signs of an impact on the victim's testimony and/or ability to testify. Attorneys do not render IAC by following a trial court's rulings. The analysis might be different if there were indications the victim did "wave [her] hand" during trial or otherwise showed signs of having difficulty testifying, but the record contains no such evidence.

---

**6**In the opening brief, defendant selectively quotes from Justice Kennard's concurring opinion in *People v. Anderson*, *supra*, 25 Cal.4th 543 to suggest that cross-examining a witness regarding current mental health is always permissible. He overlooks the following statement: "Mental illness, insofar as it affects a witness's ability to accurately perceive, remember, or describe the events about which the witness is testifying …, is relevant to credibility and may be established by cross-examination *concerning the witness's clinical history of diagnosis or treatment*. [Citations.]" (*Anderson*, at p. 608 (conc. opn. of Kennard, J.), italics added.) Defendant's trial counsel informed the trial court that counsel had "no intention of asking about any diagnosis, [or] any [prescribed] medication." Indeed, there is no evidence in the record of the victim ever being diagnosed or treated for hearing voices in her head. Moreover, the record does not contain any evidence of a specifically diagnosed mental illness. The reasons for the prior "5150 holds" and psychiatric treatment are not disclosed. The prosecutor said the only "mental health records" in the People's possession were "from 2021" (approximately two years after the last alleged act of abuse), and those records concerned unspecified "symptoms and diagnosis the victim was experiencing at that time, not earlier." As far as the record shows, the only evidence of the victim ever hearing voices, at any time, was the victim's own statements in 2022 at the preliminary hearing and competency hearing.

The second IAC claim is also untenable on direct appeal. Defendant's trial counsel is alleged to have "ineffectively failed to argue a hallucination defense." However, in defendant's own words, his trial counsel "argued that [the victim] was an uncorroborated, contradicted, and uninjured liar, who watched porn and angrily fabricated the allegations." To argue the victim's allegations may have been the product of hallucinations would require conceding the possibility the victim actually believed her allegations were true. The defense strategy, however, was to argue the victim knowingly lied for attention-seeking and vindicative reasons. A reasonably competent defense lawyer could have made a strategic decision to not argue both theories. We note the attorney declaration submitted with defendant's request for judicial notice does not address this secondary claim of IAC.

Defendant cites *People v. Pope* (1979) 23 Cal.3d 412, *People v. Ibarra* (1963) 60 Cal.2d 460, and *People v. Farley* (1979) 90 Cal.App.3d 851 to impliedly contend that not arguing a potentially meritorious defense at trial is IAC. Those opinions hold that an attorney's breach of the duty to *investigate* all available defenses of fact and law constitutes IAC if such failure "results in the withdrawal of a potentially meritorious defense." (*Pope*, at p. 425; accord, *Ibarra*, at p. 464; *Farley*, at p. 859.) There are no allegations of a failure to investigate in this case.

Defendant also fails to account for the possibility his trial counsel did not believe the victim experienced hallucinations and reasonably hoped the jury would likewise conclude the hallucination claims were more attention-seeking lies. As discussed in footnote 6, *ante*, the only evidence of the victim experiencing hallucinations at any time was the victim's own statements. There was apparently some evidence of the victim being treated for unspecified psychiatric issues a few years after the crimes allegedly occurred, but no such evidence was introduced at trial.

"Failure to argue an alternative theory is not objectively unreasonable as a matter of law." (*People v. Thomas* (1992) 2 Cal.4th 489, 531.) "That the two arguments are not

25.

absolutely incompatible does not vitiate a choice to make one or the other."  (*Id*. at pp. 531–532.)  Because defendant's trial counsel may have had strategic reasons for not arguing a so-called "hallucination defense," the IAC claim must be rejected.  (See, e.g., *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1159 ["Counsel may have wished to concentrate on the argument he viewed as more persuasive … rather than potentially confusing the issues and detracting from his credibility with the jury by making a nonpersuasive argument"].)

## DISPOSITION

The judgment is affirmed.


PEÑA, J.

WE CONCUR:


HILL, P. J.


LEVY, J.

26.